In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2933

United States of America,

Plaintiff-Appellee,

v.

Robert Bailey,

Defendant-Appellant.


Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 CR 790--Milton I. Shadur, Judge.


Argued June 8, 2000--Decided September 12, 2000


   Before Easterbrook, Kanne and Williams, Circuit
Judges.

   Kanne, Circuit Judge.  Robert Bailey, a cadet
with the Village of Maywood (Ill.) Park District
Police Department, joined other police officers
in an attempted robbery of a drug-dealer. The
"drug-dealer" proved to be part of an FBI sting
operation, and Bailey had succeeded only in
attempting to rob an undercover FBI agent. Bailey
was convicted of attempted robbery. He appeals
his conviction, claiming that the government
failed to prove the prerequisite jurisdictional
nexus to interstate commerce and that the
district court erred by instructing the jury on
a "depletion of assets" theory for the interstate
commerce nexus that was unsupported by the
evidence. Bailey also claims that the district
court made two errors at sentencing, wrongly
enhancing his sentence for possession of a
firearm and abuse of a position of trust. Finding
no errors, we affirm.

I.  History

   Bailey joined the Maywood Park District Police
Department in March 1995, as a cadet, a volunteer
training position. Cadets are not sworn police
officers, but they wear police uniforms and
patrol paired with police officers. Bailey was
assigned to patrol areas in and around various
city parks, and he worked on occasion with

Lieutenant Charles Jones and Officer Michael Broome. Bailey, Jones and Broome had previously conducted shakedowns of drug dealers, and in late 1995, the government confronted Broome with evidence of his involvement in these activities and convinced him to cooperate with the FBI. On January 16, 1996, Broome met with Jones and Bailey to plan another robbery, which in reality would be a sting operation conducted by the FBI. Broome wore a listening device to the January 16 meeting and recorded the events that transpired.

Broome told Jones and Bailey that he had an informant who owed him a favor because Broome did not charge him when Broome caught him with cocaine. This unnamed informant did not exist, but Broome produced pictures of two men to substantiate his story. Broome claimed that the informant would identify a larger drug source, from whom they could steal money and/or drugs. Broome told Bailey and Jones that his informant paid his supplier about $1,200 per ounce of cocaine. The officers decided that they would ask the informant to call his supplier to buy an ounce of cocaine, then rob the cocaine dealer of the drug purchase money. When asked if he was interested, Bailey responded, "Deal me in." Later, Bailey also told Broome that he knew sources to sell as much cocaine as they found on the supplier, if they robbed the supplier of drugs as well as money.

Broome told Bailey on January 25 that the plan they had discussed was to take place that afternoon. He asked Bailey to call Jones and to arrange to meet near Bosco Park in Maywood so that they could drive together to the deal location. He also informed Bailey that the cocaine supplier was a Mexican male. Bailey and Broome informed Jones of the rendezvous, and later Bailey met Broome, who was now wearing a listening device, at the predetermined location and drove to Bosco Park in Broome's patrol car. Jones failed to appear at the rendezvous, so Bailey and Broome proceeded without him.

The FBI set up surveillance in the park, and FBI Special Agent Miguel Del Toro (playing the role of the drug dealer) waited in a red car. Broome and Bailey arrived first and pulled up behind the red car (purportedly identified by Broome's informant), followed shortly by Jones, who drove a Maywood Park Animal Control Division van. Broome and Bailey left their patrol car and approached either side of Del Toro's car. Bailey went to the passenger side, and as he approached, Del Toro noticed that Bailey's hand rested on a black-handled, nickel-plated firearm, which he carried on his right hip. Broome ordered Del Toro out of the car, and Bailey searched the car and

Del Toro's jacket and wallet and found about $1,200 in cash. Jones never left the van but ordered Broome and Bailey to strip Del Toro and search him and his car for drugs and more cash. The search revealed no drugs. During the search, Del Toro insisted that he was a dry-waller, not a drug dealer. After the search, the officers met up to split the money. While counting the money, Broome recounted Del Toro's insistence that he installed dry-wall, to which Bailey responded, "Oh yeah, a fucking dry-waller."

Two weeks later, FBI officials confronted Bailey with pictures and other evidence of the robbery. Bailey admitted his involvement and described the event in great detail. However, he refused to admit that he possessed a firearm during the deal. Bailey was indicted on one count of robbery under the Hobbs Act, 18 U.S.C. sec. 1951, and on one count of use or possession of a firearm during and in relation to a robbery, under 18 U.S.C. sec. 924(c). Jones also was charged with these crimes, but he agreed to plead guilty to each and to testify against Bailey. Bailey chose a jury trial.

At trial, the government sought to prove jurisdiction under the Hobbs Act by presenting two types of evidence relating to criminal conduct affecting interstate commerce. First, the government presented the testimony of DEA Special Agent Nancy Lane, who testified that the coca plant, from which cocaine is derived, is not grown in Illinois and that cocaine is manufactured in South America. Second, the government introduced evidence that all fuel purchases for the Maywood police department were made through a centralized billing location in Oklahoma, thus implicating interstate commerce. The government also presented tape-recorded evidence of the January 16 meeting, photographs, tape and video recorded evidence of the January 25 shakedown, testimony from Broome, Jones and Del Toro, and evidence of Bailey's confession. Both Broome and Del Toro testified that Bailey possessed a firearm on his right rear hip during the shakedown, but the two disagreed about its color. Another government witness testified that Bailey owned a firearm but did not possess it on the day of the robbery. Bailey called only one witness, FBI Special Agent Gary Sebo, who took Bailey's confession. Bailey's counsel examined Sebo about Bailey's refusal to admit, at any point during the confession, to his possession of a gun during the robbery.

At the close of the introduction of evidence, the district court held a jury instruction conference. Bailey objected to the government's proposed jury instruction on depletion of assets.

He also tendered an alternative depletion of assets instruction. The district court overruled Bailey's objection and gave the government's proposed instruction.

The jury returned a guilty verdict on the Hobbs Act charge, but acquitted Bailey on the possession of a firearm charge. At sentencing, the government argued that Bailey's sentence merited a five-level enhancement under United States Sentencing Guidelines sec. 2B3.1(b)(2)(C) for possession of a firearm in connection with his offense, a two-level enhancement for abuse of a position of trust, pursuant to U.S.S.G. sec. 3B1.3 and an enhancement for physical restraint of Del Toro. Bailey contested each of these enhancements and also sought a two-level decrease for accepting responsibility. Judge Shadur conducted a hearing and granted the enhancements sought by the government and granted Bailey the two-level decrease he requested. The district judge computed Bailey's total offense level to be twenty-seven with a criminal history category I, requiring a sentence of seventy to eighty-seven months. Bailey was sentenced to seventy months imprisonment, followed by three years supervised release.

## II. Analysis

Bailey appeals four issues arising from his trial and sentencing. First, Bailey contends that the government failed to prove the jurisdictional prerequisites required to prosecute him under the Hobbs Act. Second, Bailey argues that the district court erred by giving a jury instruction on the "depletion of assets" theory because that theory was unsupported by the evidence. Third, Bailey argues that the district court committed clear error by finding that he possessed a gun during the course of his criminal conduct, which led the district court to enhance his sentence for use of a firearm. Fourth, Bailey finds error in the district court's determination that he occupied a position of trust and as such, was eligible for that sentencing enhancement.

## A. Interstate Commerce

Bailey contends that his conviction must be reversed because the government failed to establish that Bailey's conduct affected interstate commerce. A connection with interstate commerce is a jurisdictional requirement of 18 U.S.C. sec. 1951, see United States v. Shields, 999 F.2d 1090, 1097-98 (7th Cir. 1993), and if the government failed to present sufficient evidence of such a connection, Bailey's conviction must be overturned. Nonetheless, we grant great deference to jury verdicts and will overturn a verdict for insufficient evidence

"only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." United States v. Morrison, 207 F.3d 962, 966 (7th Cir. 2000) (internal quotation omitted).

The Hobbs Act prohibits any robbery or extortion or attempt or conspiracy to rob or extort that "in any way or degree obstructs, delays or affects commerce or the movement of any article or commodity in commerce." 18 U.S.C. sec. 1951(a). The Supreme Court has interpreted jurisdiction under sec. 1851(a) to be coextensive with the Commerce Clause, see Stirone v. United States, 361 U.S. 212, 215 (1960), so the government may prove the jurisdiction of its case by showing a de minimis or otherwise slight effect on interstate commerce. See Shields, 999 F.2d at 1098.

Because the Hobbs Act criminalizes attempts as well as completed crimes, the government need not even prove that interstate commerce was affected, only that there exists a "realistic probability" of an effect on commerce. See United States v. Anderson, 809 F.2d 1281, 1286 (7th Cir. 1987). To prove an attempt, the government must have shown only that Bailey acted with specific intent to commit the underlying offense, that is, that he intended to perform a robbery, and took a substantial step toward its completion. See United States v. Dennis, 115 F.3d 524, 534 (7th Cir. 1997). Because factual impossibility is not a defense to an attempt crime, see United States v. Weaver, 8 F.3d 1240, 1243 (7th Cir. 1993), we have found an effect on interstate commerce when the FBI provides the money extorted or stolen. See United States v. Thomas, 159 F.3d 296, 297-98 (7th Cir. 1998); Shields, 999 F.2d at 1097-98; United States v. Hocking, 860 F.2d 769, 777 (7th Cir. 1988).

A commonly employed method of showing effect on interstate commerce is the "depletion of assets" theory. Under this theory, the government shows that "commerce is affected when an enterprise, which either is actively engaged in interstate commerce or customarily purchases items in interstate commerce, has its assets depleted through extortion, thereby curtailing the victim's potential as a purchaser of such goods." United States v. Elders, 569 F.2d 1020, 1025 (7th Cir. 1978); see also United States v. Stillo, 57 F.3d 553, 558 (7th Cir. 1995); Shields, 999 F.2d at 1098. In Thomas, 159 F.3d at 297-98, we addressed the question of whether robbery of money that the defendants believed would have been used to purchase cocaine constitutes a depletion of assets satisfying the jurisdictional requirements of the Hobbs Act. Because the

government offered proof that cocaine was only available through interstate commerce, i.e., the cocaine originated in South America, we determined that a robbery of the drug money "thwarted what would have been a sale in commerce within the meaning of the Hobbs Act." Id. at 298. We also noted that the de minimis value of drug money stolen was irrelevant to the determination that the sale affected interstate commerce, since the relevant question is whether the entire class of cocaine sales depended on interstate commerce. See id.

For the government to present sufficient evidence of effect on interstate commerce under a depletion of assets theory, it must present evidence that (a) at the time that he attempted to rob Del Toro, Bailey intended to rob his victim of either cocaine or money that he believed was used to purchase cocaine, and (b) robbery of cocaine dealers generally has an effect on interstate commerce. The government presented evidence, in the form of tape-recorded conversations between Bailey and his co-conspirators and the testimony of his co-conspirator Broome, that the officers planned the robbery beforehand, specifically targeting a drug supplier whom they expected to be in possession of either cash from the sale of an ounce of cocaine or an ounce of cocaine. The government also presented Lane's expert testimony that cocaine is produced in South America. Therefore, the government asserts that cocaine must enter Illinois through interstate commerce. The result is, the government contends, that the robbery of cocaine dealers depleted the assets available to purchase cocaine through interstate commerce, thereby creating the requisite effect on interstate commerce.

Bailey contends that the government's evidence was insufficient because the effect on interstate commerce was "purely imaginary." He argues that there was never a possibility of affecting interstate commerce because no cocaine was present, Del Toro did not intend to make a sale or purchase affecting interstate commerce and the money that Bailey took from Del Toro was FBI money that would never be used in interstate commerce. Bailey attempts to distinguish this case from cases such as Thomas and Shields, in which we held that attempts to rob FBI agents of drug money met the jurisdictional requirements of the Hobbs Act. See Thomas, 159 F.3d at 297; Shields, 999 F.2d at 1097-98. In those cases the FBI agents were planning actual transactions that would have affected interstate commerce, rather than fake transactions as here. That difference is immaterial.

In Thomas, there was no cocaine present when the FBI informant was robbed and, despite Bailey's contention to the contrary, no actual transaction involving interstate commerce took place. Nonetheless, we found a nexus to interstate commerce on the grounds that the potential transaction, a sale of cocaine, was of the class that in the aggregate has an effect on interstate commerce. See Thomas, 159 F.3d at 298. In addition, we noted in Shields that one could be convicted of attempt under the Hobbs Act "even though no money has changed hands." Shields, 999 F.2d at 1098. Bailey's conviction for attempt was premised on the evidence showing that he had formed a specific intent to rob a cocaine dealer, the evidence showing that he took a significant step toward robbing a cocaine dealer by taking money from someone who was identified to him as a drug dealer and the evidence showing that the robbery of cocaine dealers has an effect on interstate commerce. The fact that Bailey was unable to complete the underlying acts to which he had developed a specific intent is irrelevant to his attempt, and the fact that the connection to interstate commerce under these facts arises primarily from his specific intent is equally irrelevant. For this reason, we find that the government presented sufficient evidence to prove an effect on interstate commerce. Because the government's presentation of evidence on the depletion of assets of cocaine dealers satisfies its jurisdictional burden, we need not address whether the use of gasoline in the Maywood police vehicle affects interstate commerce.

B.  Jury Instructions

Bailey also argues that the district court erred in giving the jury a "depletion of assets" instruction, which he claims lacked sufficient basis in the evidence. We review de novo a district court's decision to give or not to give a jury instruction. See United States v. Brack, 188 F.3d 748, 761 (7th Cir. 1999). However, we grant great deference to the district court's choice of language in jury instructions, upholding instructions that are "accurate statements of the law and which are supported by the record." United States v. Vang, 128 F.3d 1065, 1069 (7th Cir. 1997) (internal quotation omitted).

At the instruction conference, Bailey objected to the government's instruction for jurisdiction based on interstate commerce on the grounds that after United States v. Lopez, 514 U.S. 549 (1995), the "depletion of assets" instruction no longer accurately reflected the law. Bailey did not argue that the government failed to produce evidence of depletion of assets, and he presented

an alternative instruction that also applied the depletion of assets basis for jurisdiction. On this basis, the government argues that Bailey has waived this claim, precluding us from reviewing it on appeal. See United States v. Staples, 202 F.3d 992, 995 (7th Cir. 2000).

Waiver is the intentional relinquishment of a known right. See id. In the context of a jury instruction, a party must state both the matter objected to and the grounds objected on to preserve the objection for appellate review. See Cefalu v. Village of Elk Grove, 211 F.3d 416, 426 (7th Cir. 2000); Fed. R. Crim. P. 30. At the instruction conference, Bailey stated his objection to the interstate commerce instruction, but he based his argument on the legal accuracy of the instruction, not on the lack of factual support for it in the record. However, his failure to object on the grounds he now raises does not equate with an "intentional relinquishment," and we have previously found in cases where defendants objected on unstated grounds that these objections constituted a forfeiture, rather than a waiver. See United States v. Griffin, 84 F.3d 912, 924-25 (7th Cir. 1996); United States v. Ross, 77 F.3d 1525, 1538-42 (7th Cir. 1996).

For this reason and because Bailey proffered an alternative jury instruction rather than merely objecting to the government's instruction, we refuse to find a waiver in this case. However, Bailey has forfeited his claim by failing to raise it at the proper time, so we review only for plain error. Under this standard, we will reverse only if we find "particularly egregious errors" or if we must prevent "a miscarriage of justice." United States v. Franklin, 197 F.3d 266, 270 (7th Cir. 1999).

We find no error in allowing the interstate commerce instruction based on the evidence presented at trial. The government produced evidence in support of its depletion of assets theory. The reasonable inference of Lane's testimony was that cocaine only arrives in Illinois as a result of interstate commerce. This testimony, along with the tape recordings of Bailey and the other officers, suggests that the money Bailey attempted to steal from Del Toro was money he believed was used to purchase goods received in interstate commerce. The theft of such money would have depleted available assets for interstate commerce. This evidence is enough to support the depletion of assets instruction.

C. Use of a Firearm

The district court enhanced Bailey's sentence

five levels based on the finding that Bailey was in possession of a firearm during the commission of his robbery. We review for clear error the sentencing court's findings of fact. See United States v. Watson, 189 F.3d 496, 501 (7th Cir. 1999). A sentencing court commits clear error when "we are left with a definite and firm conviction that a mistake has been made," United States v. Strache, 202 F.3d 980, 984-85 (7th Cir. 2000) (citation omitted). Where two permissible interpretations of the evidence are possible, a factfinder's choice of one is not clearly erroneous. See United States v. McGill, 32 F.3d 1138, 1143 (7th Cir. 1994).

United States Sentencing Guidelines sec. 2B3.1(b)(2)(C) requires courts to increase a defendant's total offense level by five levels when a firearm was "brandished, displayed, or possessed" during the commission of a robbery. U.S.S.G. sec. 2B3.1(b)(2)(C). Guidelines sec. 1B1.3(a)(1) also provides that sentencing courts should take into account "all reasonably foreseeable acts and omissions of others in furtherance of a jointly undertaken criminal activity," U.S.S.G. sec. 1B1.3(a)(1)(B), which includes the possession of firearms by co-conspirators during the commission of a robbery. See United States v. Dorsey, 209 F.3d 965, 967-68 (7th Cir. 2000). Bailey does not contest the applicability of these guidelines to his conduct, but argues that the district court committed clear error in finding that he possessed a firearm and that he could have reasonably foreseen that Jones would be in possession of a firearm.

A sentencing court may consider whatever information it possesses, as long as this evidence "includes sufficient indicia of reliability to support its probable accuracy." Morrison, 207 F.3d at 967. Because the government only must prove relevant conduct by a preponderance of the evidence at sentencing, sentencing courts may include as relevant conduct acts for which the defendants have been acquitted. See United States v. Kroledge, 201 F.3d 900, 908 (7th Cir. 2000). In making its determination that Bailey possessed a firearm during the robbery, Judge Shadur focused on the testimony of Broome and Del Toro that Bailey possessed a firearm and on photographs of Bailey approaching Del Toro's car with his hand placed where both Del Toro and Broome testified that Bailey kept his firearm. The district judge based his finding that co-defendant Jones possessed a gun on Jones's admission in his plea agreement that he possessed a firearm during the robbery.

There was no clear error in determining that

Bailey possessed a firearm when the robbery occurred. Broome and Del Toro both testified that Bailey possessed a firearm. Although the two witnesses dispute the color and exact placement of the firearm, both agreed that the gun was kept at Bailey's right rear hip. Photographs taken of Bailey approaching the car immediately before the robbery show him slightly crouched with his hand placed over the area where Broome and Del Toro testified Bailey kept his firearm. This body language reasonably suggests that Bailey possessed a handgun and wanted it close at hand if complications ensued. As Bailey argues, the evidence also could reasonably be interpreted in an alternative manner. The witnesses' testimony conflicts, and neither witness had an unobstructed view of Bailey's firearm. The photographic record never captures the firearm. It might even be equally likely that Bailey would wish to pretend to have a gun while approaching the robbery to keep the victim in fear for his life. However, on review our task is not to choose between reasonable alternatives that the sentencing court might have chosen. Our task is to determine whether the district court made a reasonable assessment based on the evidence presented, see McGill, 32 F.3d at 1143, and we believe that the evidence available for appellate review/1 could reasonably have been determined to show by a preponderance that Bailey was in possession of a firearm. We find no clear error in the conclusions of the district court. Because we find no clear error in the court's conclusion that Bailey possessed a firearm, we will not consider whether the court's alternative basis for the enhancement was clear error.

D.   Abuse of Trust

   Finally, Bailey contends that the district court erred in enhancing his sentence pursuant to U.S.S.G. sec. 3B1.3 for abuse of a position of trust. He claims that, as a police cadet, he did not occupy a position of trust. The district court's finding that Bailey occupied a position of public trust is a question of fact, which we review for clear error. See United States v. Vivit, 214 F.3d 908, 922 (7th Cir. 2000).

   Guidelines sec. 3B1.3 directs courts to increase a defendant's total offense level by two levels when "the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. sec. 3B1.3. We employ a two-part test to determine whether sec. 3B1.3 applies, asking (1) whether the defendant occupied a position of trust and (2) whether his abuse of the position of trust significantly facilitated the commission of the

offense. See United States v. Sierra, 188 F.3d 798, 802 (7th Cir. 1999). Application note 1 to sec. 3B1.3 clarifies that positions of public trust are "characterized by professional and managerial discretion," and are "subject to significantly less supervision" than other positions. U.S.S.G. sec. 3B1.3 application note 1. However, "[i]n determining whether the defendant occupied a position of trust [a defendant's] diminutive title or lack of sweeping power is unimportant." Sierra, 188 F.3d at 802. Instead, we focus on whether a person had governmental power or access to or authority over other things of value. See id.; United States v. Stewart, 33 F.3d 764, 768 (7th Cir. 1994). Because of the nature of their position, the well-settled law of this circuit holds that police officers occupy a position of trust. See Sierra, 188 F.3d at 802; United States v. Parker, 25 F.3d 442, 450 (7th Cir. 1994). In addition, application note 2 to sec. 3B1.3 informs courts that the enhancement will also apply when "the defendant provides sufficient indicia to the victim that the defendant legitimately holds a position of private or public trust," even if the defendant does not actually hold such a position. See U.S.S.G. sec. 3B1.3 application note 2./2

The district court found that Bailey "was someone who was armed with apparent authority of the type that would facilitate the kind of offense that's involved here, even though he was not a sworn officer." The court held that Bailey took advantage of this position, and on this basis, the court enhanced his sentence under sec. 3B1.3. Bailey does not contest that if we uphold the district court's determination that he occupied a position of trust, his abuse of this position significantly facilitated the commission of his offense. Instead, Bailey focuses on whether he occupied a position of trust, claiming that, as a cadet, he was under close supervision and lacked the actual authority necessary to occupy a position of public trust.

As a cadet, Bailey was supervised closely and had little actual authority. However, title and lack of authority are not dispositive if the defendant provides "sufficient indicia of authority" to convince the victim that he possesses authority. See U.S.S.G. sec. 3B1.3 application note 2. Police officers occupy positions of public trust, and individuals who have apparent authority of police officers when facilitating the commission of an offense abuse the trust that victims place in law enforcement. To the general public, police cadets are not distinguishable from police officers. In performing the shakedown, Bailey arrived in a police cruiser with another police officer, wore

an official police uniform, acted as if he were a police officer and never informed Del Toro, the purported victim, that he was not a police officer. From Del Toro's perspective, there was no reason to suspect that Bailey did not occupy the position of trust that he appeared to occupy.

Bailey argues that Del Toro knew ahead of time that Bailey was only a cadet, and therefore, from the perspective of the victim, the government cannot show that Bailey occupied a position of public trust. However, application note 2 to sec. 3B1.3 clarifies that the guideline requires only that a defendant provide sufficient indicia to the victim demonstrating that the defendant occupies a position of public trust, not that the victim must believe or accept these indicia. See U.S.S.G. sec. 3B1.3 application note 2. Bailey portrayed himself as a police officer in an attempt to force Del Toro to pay him off, and by so doing, Bailey took advantage of this apparent authority to engage in criminal activity. On this basis, we find no error in the district court's conclusion that Bailey's behavior constituted "a classic instance of abuse of trust."

III.  Conclusion

For all the foregoing reasons, we Affirm the decisions of the district court.


/1 Bailey referenced the government's exhibit photograph eight on numerous occasions in his briefing as evidence that Bailey actually kept handcuffs, not a firearm, on his right rear hip during the robbery. Unfortunately, this photograph was not included within the appellate record, so we cannot review it. See, e.g., Aliwoli v. Gilmore, 127 F.3d 632, 633 (7th Cir. 1997).

/2 Bailey urges us not to consider application note 2 to sec. 3B1.3 because it was added by amendment to the Guidelines in 1997, after Bailey had committed the predicate conduct to his offense. Generally, to avoid Ex Post Facto Clause violations, we apply the sentencing guidelines in effect at the time of commission of the offense. See Vivit, 214 F.3d at 917. However, we consider an amendment made to the commentary to a guideline if the amendment is made to clarify, rather than substantively change the Guidelines. See U.S.S.G. sec. 1B1.11(b)(2); United States v. Downs, 123 F.3d 637, 643 (7th Cir. 1997). An amendment to the commentary of a Guideline serves a clarifying purpose if the amendment leaves the text of the guideline untouched and reasonably interprets the existing language of the Guidelines. Id. Amendment 580 to the Sentencing

Guidelines, which adopts sec. 3B1.3 application note 2, does not alter the text of sec. 3B1.3. See U.S.S.G. Appendix C, amendment 580. Moreover, prior to the promulgation of application note 2, this Circuit viewed the question whether a defendant occupied a position of trust from the viewpoint of the victim, see United States v. Hathcoat, 30 F.3d 913, 919 (7th Cir. 1994), and interpreted sec. 3B1.3 to include the impostor as well as the person who legitimately abuses a position of trust. As such, amendment 580 did not create new substantive law. This amendment to sec. 3B1.3 merely clarified our existing interpretation of sec. 3B1.3, and for this reason, we do not violate the Ex Post Facto Clause by including application note 2 in our analysis of Bailey's conduct.